## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIE INSURANCE EXCHANGE, an unincorporated association, by TROY STEPHENSON, CHRISTINA STEPHENSON, and STEVEN BARNETT, trustees *ad litem,* and alternatively, ERIE INSURANCE EXCHANGE, by TROY STEPHENSON, CHRISTINA STEPHENSON, and STEVEN BARNETT, <br><br> Plaintiff, <br><br> v. <br><br> ERIE INDEMNITY COMPANY, <br><br> Defendant. | Civil Action No. 2:22-cv-166 <br><br> Electronically Filed |

### NOTICE OF REMOVAL

**PLEASE TAKE NOTICE THAT** Defendant Erie Indemnity Co. ("Indemnity"), by and through its counsel, Dechert LLP and Knox McLaughlin Gornall & Sennett, P.C., reserving any and all defenses and exceptions, hereby removes the above-captioned action from the Court of Common Pleas, Allegheny County, Pennsylvania, to the United States District Court for the Western District of Pennsylvania (Erie Division) pursuant to 28 U.S.C. §§ 1441 and 1453 on the grounds of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

In support of this Notice of Removal, Indemnity states as follows:

### INTRODUCTION

1.    This Notice of Removal is the direct consequence of Plaintiffs' frantic effort to escape the jurisdiction of this Court and the impact of its ruling three years ago in *Ritz v. Erie Indemnity Company*, No. 17-340, 2019 WL 438086 (W.D. Pa. Feb. 4, 2019). This Court dismissed Ritz's claim with prejudice based on claim preclusion. In dismissing the claim, the Court found

that both the *Ritz* action and a prior action, *Beltz*, "detail an alleged scheme . . . to favor the shareholders over the subscribers by allegedly violating the 25% compensation cap mandated by the Subscriber's Agreement." *Id.* at *4. This Court ruled that the claim in *Ritz* was barred by claim preclusion because the defendants prevailed in *Beltz*, the two cases arose from "the 'same cause of action,'" and all subscribers of Erie Insurance Exchange ("Exchange") are in privity with each other. *Id.* Because this case shares all of those characteristics, the Court's ruling in *Ritz* necessarily requires that this Complaint, too, is barred by claim preclusion.

2.      It is that result that Plaintiffs desperately seek to flee. Their fear is understandable, since this case is a virtual carbon copy of the *Ritz* case, which was pleaded as a class action pursuant to CAFA. In the instant action, Plaintiffs, as in *Ritz*, claim that Indemnity breached its fiduciary duty when it took a 25% Management Fee expressly permitted by the Subscriber's Agreement, the foundational document governing the rights and obligations of the parties to this lawsuit. As in *Ritz*, Plaintiffs here allege that Indemnity accomplished this purported breach of fiduciary duty by abusing its position under the Subscriber's Agreement as the attorney-in-fact for the subscribers. Compl. ¶ 10, *Erie Ins. Exch. v. Erie Indem. Co.*, No. GD-21-014814 (Pa. Ct. Com. Pl. Allegheny Cnty. Dec. 6, 2021) (hereafter "Compl."), attached hereto as Exhibit 1; *Ritz*, 2019 WL 438086, at *1. As in *Ritz*, Plaintiffs here assert that this abuse occurred because Indemnity set out to favor its shareholders over the subscribers. Compl. ¶¶ 47, 54; *Ritz*, 2019 WL 438086, at *4. As in *Ritz*, Plaintiffs here say they are acting on behalf of Exchange to benefit the same class—all Erie subscribers. And, as in *Ritz*, Plaintiffs here demand that Indemnity's Management Fee be disgorged as relief for the alleged breach of fiduciary duty. Compl. ¶¶ 82, 90; *Ritz*, 2019 WL 438086, at *1.

3.      It is no wonder then that Plaintiffs in this action have contorted themselves into a series of baseless and increasingly desperate positions in their effort to both escape CAFA jurisdiction and re-litigate the *Ritz* judgment in state court.  In the latest iteration of this seemingly never-ending saga, Plaintiffs filed a class action in the Common Pleas Court for Allegheny County complaining, yet again, about Indemnity taking the 25% Management Fee set out in the Subscriber's Agreement.  Indemnity timely removed that action to this Court.  After reviewing the Notice of Removal, Plaintiffs chose to voluntarily dismiss that action rather than move to remand. Then, just a few weeks later, Plaintiffs re-filed their action, again in Allegheny County.  This "new" complaint was the substantive equivalent of their first filing.  It changed little, if anything, other than to delete the class action label through which Plaintiffs originally sought to represent a million Erie subscribers who were residents of Pennsylvania and substitute in its place a new label stating that the action was now being brought in the name of Exchange in order to "benefit all members of Exchange," an even larger group of subscribers.  Compl. ¶ 16.

4.      This conduct by Plaintiffs presents at least three separate bases that justify removal. *First*, inasmuch as the second filing is substantively equivalent to the "class action" they initially filed (and to the *Ritz* class action), that second filing qualifies as a "class action" under CAFA. *Second*, Plaintiffs' contrived dismissal and amendment tactic runs afoul of the well-established rule that plaintiffs cannot extinguish federal jurisdiction by amending their complaint after removal.  *Third*, federal law, including United States Supreme Court precedent, is clear that efforts to thwart federal jurisdiction must be disregarded and federal jurisdiction maintained where, as here, plaintiffs employ pleading artifices to evade CAFA's removal protections.

5.      These three fundamental features of Plaintiffs' latest gambit to avoid this Court's ruling in *Ritz* also create a stark contrast with the Third Circuit's ruling in *Erie Insurance Exchange*

*v. Erie Indemnity Co.*, 722 F.3d 154 (3d Cir. 2013) ("*Sullivan*").  There, the Third Circuit, on the record before it, concluded that claims under Pennsylvania Rules of Civil Procedure 2152 and 2177 did not, on their own, trigger CAFA jurisdiction.  However, the Third Circuit was not confronted with any of the three bases of jurisdiction set forth above.  There was no consideration of the dismiss-and-amend tactic like the one deployed here.  And the Court expressly reserved judgment on whether jurisdiction *would* exist where Plaintiffs *had* initially filed their claim as a class action or where Plaintiffs *had* exhibited a pattern of evasion.

6.     At bottom, this case is a paradigm of the types of lawsuits that Congress intended to cover when it passed CAFA.  Plaintiffs' relentless efforts to elude federal court cannot obscure that obvious fact.  This matter belongs in federal court and all efforts to hide from that reality should be rejected.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     THE ERIE INSURANCE GROUP

7.     Erie Insurance Group ("Erie") is a reciprocal insurance business consisting of two key entities.  The first entity is Exchange.  Erie policyholders, known as "subscribers"—which now total more than two million subscribers across 12 states and the District of Columbia—agree to pool their risk by insuring each other through their exchange of reciprocal insurance obligations.  Exchange is the legal entity that acts to effectuate the pooling of these individual insurance obligations and accordingly is the technical insuring entity that issues the subscribers' insurance policies.  Exchange does not have (and is not required by law to have) any directors, officers, or employees.  Compl. ¶¶ 2–3.

8.     The second key legal entity is Indemnity.  Indemnity is not an insuring entity, but rather is a public corporation that manages the insurance function for the subscribers.  It is

appointed by each subscriber individually to perform that function.  Compl. ¶ 5; Erie Indemnity

Co. 2020 Form 10-K at 3 (Feb. 25, 2021) (hereinafter, "2020 Form 10-K").[1]

9.      The foundational document creating and governing Erie's reciprocal arrangement,

and the relationship and rights between Indemnity and the subscribers, is the Subscriber's

Agreement.  The Subscriber's Agreement is a single-page, identical agreement signed individually

by each subscriber from all 12 states and the District of Columbia, regardless of where they are

domiciled or reside.   The Subscriber's Agreement: (a) creates the subscribers' exchange of

identical reciprocal insurance obligations among and between the subscribers; (b) appoints

Indemnity to serve as the management entity for all of the subscribers regardless of their

geographic location or policy type; (c) sets out Indemnity's responsibilities in managing the

obligations of the subscribers to each other; and (d) specifies Indemnity's compensation for

managing this reciprocal insurance business.  Compl. ¶¶ 21–23, 27; Compl. Ex. A[2]; 2020 Form

10-K at 3.

10.     Subscribers pay premiums in return for their insurance policies, and "[t]hese

premiums, along with investment income, are the major sources of cash that support the operations

of the Exchange."  2020 Form 10-K at 35.

---

[1] Plaintiffs rely upon Indemnity's 2020 Form 10-K in their Complaint.  *See, e.g.*, Compl. ¶¶ 45, 60.  The Third Circuit has held that, in removal proceedings, a district court may take judicial notice of documents "integral to or explicitly relied upon in the complaint," as well as SEC filings. *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

[2] Plaintiffs cited, but did not attach, the Subscriber's Agreement as Exhibit A to their Complaint. *See* Compl. ¶ 22 ("A true and correct exemplar of the Subscriber's Agreement is attached hereto at Exhibit A.").   Accordingly, Indemnity cites to Exhibit A from Plaintiffs' first complaint. Compl., *Stephenson et al. v. Erie Indem. Co.*, No. GD-21-010046 (Pa. Ct. Com. Pl. Allegheny Cnty. Aug. 24, 2021), attached hereto as Exhibit 2.

11.    The surplus in Exchange, which is used to pay claims, is "determined under statutory accounting principles." *Id.*

12.    Under Indemnity's management, the surplus has grown substantially.  It increased from $4.8 billion in 2009, *see* 2009 Erie Indemnity Company Annual Rep. at 5, to $7.7. billion in 2016, *see* 2016 Erie Indemnity Company Annual Rep. at 4, to $9.5 billion in 2019 and then increased another $1.2 billion to $10.7 billion in 2020, *see* 2020 Form 10-K at 35.  In other words, Indemnity's provision of management services has driven an almost 125% increase in a decade in the surplus available to pay the claims of subscribers.  This continuous and steady growth "reflect[ed] a disciplined approach to underwriting and a sharpened focus on investments."  2020 Erie Indemnity Company Annual Rep. at 5, 10, *available at* https://bit.ly/3GVwl4v.

13.    Given the annual upward trajectory of the surplus—even during a global pandemic—there is no reason to believe that the current surplus is insufficient to cover claims filed, to pay any appropriate dividend, or to fund any necessary expense for the benefit of the subscribers.  Importantly, Plaintiffs do not allege otherwise.

14.    Pursuant to the Subscriber's Agreement, each subscriber expressly agreed that Indemnity may "retain up to 25% of all premiums written or assumed by [Exchange]" as "compensation" for its management services (*i.e.*, the "Management Fee").  *See* Compl. Ex. A; *see also* Compl. ¶¶ 27–28.

15.    Indemnity's Management Fee is set once a year on a nationwide basis and applies to all subscribers regardless of their type of policy.  In setting the Management Fee, no consideration is given to any factor pertinent to individual subscribers or geography.  Rather, it is one, undifferentiated, across-the-board fee, the burden of which is borne equally by each

subscriber in all the jurisdictions in which the Erie Insurance Group does business.  Plaintiffs do not allege otherwise.

16.    "The process of setting the management fee rate includes the evaluation of current year operating results compared to both prior year and industry estimated results for both Indemnity and the Exchange, as well as consideration of several factors for both entities including: their relative financial strength and capital position; projected revenue, expense and earnings for the subsequent year; future capital needs; as well as competitive position."  2020 Form 10-K at 3.

17.    For 2020 and 2021, Indemnity set the Management Fee at 25%.  Compl. ¶¶ 70, 76. In 2020, the total Management Fee—for all subscribers across all states and the District of Columbia—was $1.9 billion.  *Id.* ¶ 61.

18.    As noted above, Plaintiffs do not claim that Indemnity breached the Subscriber's Agreement's compensation cap by taking more than 25% of all premiums written or assumed by Exchange, and therefore do not bring a breach of contract claim.  Instead, Plaintiffs complain, in a tautological fashion, that Indemnity's taking of the Management Fee, which is expressly agreed to by each subscriber in the Subscriber's Agreement, "is preventing the same funds from being available for the use and benefit of Exchange."  *Id.* ¶ 75.  Of course, any dollar used to pay Indemnity for its management services is a dollar less that goes directly into Exchange, just as the dollars paid to buy eggs in a supermarket necessarily reduce the amount that a consumer has to buy other groceries.  But that unremarkable observation does not mean the money expended, whether for eggs or management services, does not confer a "benefit."  And, if applied to its logical conclusion, that proposition would prohibit Indemnity from taking *any* Management Fee, despite the express terms of the Subscriber's Agreement and despite the magnitude, nature, and consequent benefit that is conferred on the subscribers by Indemnity's management services.

19.     Moreover, Plaintiffs make this claim notwithstanding the fact that, as noted above, Exchange's surplus has expanded consistently and dramatically in the recent past.  This fact alone establishes that Indemnity's Management Fee conferred a substantial benefit on the subscribers as a result of Indemnity's management of the insurance business.  In any event, Plaintiffs' failure to allege a single fact that articulates any reasonable basis to establish that Exchange cannot meet its responsibilities to the subscribers, let alone as a direct result of the size of Indemnity's Management Fee, demonstrates the vacuous nature of Plaintiffs' claim and the fact that the instant Complaint is indistinguishable from the prior complaints discussed herein.

20.     Further, the Subscriber's Agreement specifically states that it is only *after* Indemnity's Management Fee is paid from the premiums received that the "*rest of the premiums will be used for losses, loss adjustment expenses, . . . establishment of reserves and surplus, . . . dividends and other purposes* [Indemnity] decide[s] are to the advantage of Subscribers." Compl. Ex. A.  In other words, every subscriber has agreed, in direct conflict with what Plaintiffs now allege, that dividends, loss reserves, and other items beneficial to subscribers must come out of the premium dollars left over *after*, not *before*, the Management Fee is paid. Plaintiffs' theory thus fundamentally conflicts with the Subscriber's Agreement they signed.

## II.     THE HISTORY OF SUBSCRIBER MANAGEMENT FEE LITIGATION AGAINST INDEMNITY

21.     This is the ***tenth*** complaint, going back nearly ten years, filed by subscribers challenging Indemnity's compliance with the compensation cap laid out in the Subscriber's Agreement, including the 25% cap on Indemnity's Management Fee.  All of those complaints (like this lawsuit) asserted claims by a single or handful of subscribers on behalf of a group of similarly situated subscribers, at all times exceeding a million in number across multiple states and the District of Columbia.

A.    The *Sullivan* Litigation

22.    On August 1, 2012, four subscribers filed suit in the Pennsylvania Court of Common Pleas for Fayette County against Indemnity.  Compl., *Erie Ins. Exch. v. Erie Indem. Co.*, No. 1712 of 2012, G.D. (Pa. Ct. Com. Pl. Fayette Cnty. Aug. 1, 2012) (hereinafter "*Sullivan*"), attached hereto as Exhibit 3.  The plaintiffs' complaint alleged that Indemnity "ha[d] received from Exchange the maximum amount of 25% of Exchange's written and assumed premiums since 2007" and that the receipt of those funds coupled with other fees received constituted excessive compensation in breach of its fiduciary duty arising from the Subscriber's Agreement 25% cap on the Management Fee.  Ex. 3 ¶¶ 20, 25, 31.

23.    Because the *Sullivan* complaint asserted claims by subscribers "on behalf" of Exchange and all of its subscribers, and sought damages in excess of $300 million, *id.* Count I, II, & III & ¶ 27, Indemnity removed the *Sullivan* complaint to the U.S. District Court for the Western District of Pennsylvania on August 22, 2012.  *See* Notice of Removal, *Erie Ins. Exch. v. Erie Indem. Co.*, No. 12-1205, Dkt. 1 (W.D. Pa. Aug. 22, 2012), attached hereto as Exhibit 4.  Indemnity maintained that removal was proper under CAFA because the *Sullivan* complaint was brought "on behalf of" the millions of other subscribers across numerous states.  *See, e.g.*, *id.* ¶ 12.

24.    The question of whether the *Sullivan* complaint properly belonged in state rather than federal court ultimately was presented to the U.S. Court of Appeals for the Third Circuit. However, after filing the *Sullivan* complaint and before the appeal to the Third Circuit, the *Sullivan* plaintiffs filed yet another complaint, this time in federal court.  *Erie Ins. Exch. v. Stover et al.*, No. 13-37, Dkt. 1 (W.D. Pa. Feb. 6, 2013) ("*Beltz*"), attached hereto as Exhibit 5; *see infra* Section II.B.  This new federal court complaint, which was brought on behalf of a putative class of all subscribers, again challenged Indemnity's compliance with the Subscriber's Agreement's limit on

8

Indemnity's compensation. Clearly understanding the fundamental nature of its claim, the plaintiffs explicitly invoked CAFA jurisdiction.

25.    On appeal, the Third Circuit ruled that it could not consider an amended complaint that had been filed in federal court in its analysis of whether federal jurisdiction existed because that complaint was filed *after* removal and the law was clear that only matters existing *before* removal could be considered. *See Erie Ins. Exch. v. Erie Indem. Co.*, 722 F.3d 154, 158 n.3 (3d Cir. 2013). The Third Circuit then held that, based on the record before it and because the plaintiffs had never invoked Pennsylvania's class action procedural rules, federal court jurisdiction over the *Sullivan* complaint did not lie under CAFA.

26.    In making its ruling, the Third Circuit also explicitly noted that there was no need to consider whether the plaintiffs had attempted to evade federal jurisdiction. The Court reached that conclusion since it found that no evidence had been presented that the plaintiffs had engaged in any efforts "to avoid 'federal jurisdiction.'" *Id.* at 163 n.9 (distinguishing and quoting *Freeman v. Blue Ridge Paper Prods., Inc.*, 551 F.3d 405, 407 (6th Cir. 2008)). If anything, the Court noted that the opposite was true there—because three of the four *Sullivan* plaintiffs had filed a separate class action *in federal court*. *Id.* at 157, 163 & n.9. Therefore, the Third Circuit made clear that it was not ruling on any question concerning evasion of federal jurisdiction under CAFA because there was no evidence that plaintiffs had sought to "avoid 'federal jurisdiction.'" *Id.* at 163 n.9.

27.    During the remanded proceedings in *Sullivan*, the *Beltz* plaintiffs filed another complaint, *see infra* Section II.B, and the *Sullivan* plaintiffs moved to stay their state court proceedings in favor of the federal action. They argued that a stay pending the resolution of the federal class action would "(A) conserve judicial resources; (B) avoid conflicting rulings; and (C) afford deference to the more comprehensive federal court action." Mem. of Law in Support

of Pls.' Mot. to Stay at 1, *Erie Ins. Exch. v. Erie Indem. Co.*, No. 1712 of 2012, G.D. (Pa. Ct. Com. Pl. Allegheny Cnty. Sept. 12, 2016). The *Sullivan* plaintiffs emphasized that a stay would "allow all of the substantive claims" asserted in the case "to be litigated and decided in one [class action] proceeding," *id.* at 5, explaining that "[a]bsent a stay of this case, there is the potential for conflicting rulings between a state and federal court involving the same claims," *id.* at 7. The *Sullivan* plaintiffs thus did a complete about face, effectively abandoned their fight to have their action decided in state court, and acknowledged that the federal CAFA proceedings—in which they alleged the same claims—were the most appropriate vehicle for the disposition of their claims.

   **B.    The *Beltz* Litigation**

28.    As noted above, on February 6, 2013, while the *Sullivan* appeal was pending in the Third Circuit, three of the four *Sullivan* plaintiffs filed a lawsuit in the U.S. District Court for the Western District of Pennsylvania, challenging the same compensation cap that the *Sullivan* complaints challenged, but seeking relief both on behalf of a putative class of all subscribers and derivatively on behalf of Exchange. *See* Ex. 5.

29.    The substance of the *Beltz* complaint was identical to the *Sullivan* complaint in all material respects. Like the *Sullivan* complaint before it, the *Beltz* complaint alleged that, "[s]ince at least 2007, Indemnity has received from Exchange the maximum amount of 25% of Exchange's written and assumed premiums as compensation for its services under the Subscriber Agreement" and was breaching its fiduciary duty in connection with Indemnity's compensation. *See, e.g.*, Ex. 5 ¶¶ 36, 54, 66.

30.    The most meaningful difference between the *Sullivan* and *Beltz* complaints was that the *Beltz* complaint, in addition to being brought derivatively, was also brought as a class action under CAFA. *Compare* Ex. 3, *with* Ex. 5.

31.    The *Beltz* plaintiffs then amended their complaint twice.  *See* 1st Am. Compl., *Erie Ins. Exch. v. Stover et al.*, No. 13-37, Dkt. 32 (W.D. Pa. June 5, 2013), attached hereto as Exhibit 6; *Erie Ins. Exch. v. Stover et al.*, No. 13-37, Dkt. 49 (W.D. Pa. July 18, 2013), attached hereto as Exhibit 7.  Throughout each amended complaint, the *Beltz* plaintiffs continued to challenge Indemnity's compliance with the Subscriber's Agreement's 25% compensation cap in the same way as they did in *Sullivan*.  And they continued to assert their claims were class actions, invoking CAFA as the basis for federal court jurisdiction.  *See, e.g.*, Ex. 5 ¶¶ 24, 36, 54, 66; Ex. 6 ¶¶ 24, 36, 55, 66; Ex. 7 ¶¶ 28, 40, 60, 70.

32.    On the defendants' motions to dismiss, the District Court dismissed the *Beltz* case without prejudice.  Op. & Order, *Erie Ins. Exch. v. Stover et al.*, No. 13-37, Dkt. 85 (W.D. Pa. Feb. 10, 2014).  The plaintiffs unsuccessfully appealed that dismissal to the Third Circuit.  *Erie Ins. Exch. ex rel. Beltz v. Stover*, 619 F. App'x 118 (3d Cir. 2015).

33.    The *Beltz* plaintiffs then proceeded in 2016 to refile their case.  The "new" (fourth) complaint ("*Beltz II*") yet again alleged that, "since at least 2007, Indemnity has retained the maximum amount allowed by the Subscriber's Agreement of all premiums written or assumed by Exchange," and alleged that Indemnity violated the 25% compensation cap mandated by the Subscriber's Agreement, just as was alleged in *Sullivan* and in the first *Beltz* complaints.  *Beltz v. Erie Indem. Co.*, No. 16-179, Dkt. 1 ¶ 84 (W.D. Pa. July 8, 2016) ("*Beltz II*"), attached hereto as Exhibit 8.  And the *Beltz II* plaintiffs again invoked CAFA jurisdiction on behalf of a putative class of all Exchange subscribers.  Ex. 8 ¶¶ 8, 89.

34.    The District Court dismissed the *Beltz II* plaintiffs' complaint with prejudice on July 17, 2017, holding, among other things, that Indemnity did not breach the Subscriber's Agreement's 25% compensation cap and that the plaintiffs' breach of fiduciary duty and

conversion claims were barred as untimely under Pennsylvania's two-year statute of limitations. *Beltz v. Erie Indem. Co.*, 279 F. Supp. 3d 569, 579–84 (W.D. Pa. 2017).  On appeal, the Third Circuit affirmed, holding, among other things, that Indemnity did not breach the Subscriber's Agreement's 25% compensation cap and that the plaintiffs had forfeited their breach of fiduciary duty claims.  *Beltz v. Erie Indem. Co.*, 733 F. App'x 595 (3d Cir. 2018).

    C.    **The *Ritz* Litigation**

    35.    During the pendency of the *Beltz II* plaintiffs' appeal, an additional plaintiff filed another lawsuit in this Court challenging Indemnity's compliance with the Subscriber's Agreement 25% compensation cap.  Compl., *Ritz v. Erie Indem. Co.*, No. 17-340, Dkt. 1 (W.D. Pa. Dec. 28, 2017), attached hereto as Exhibit 9.  That complaint made the same allegations the *Sullivan* and *Beltz* complaints had made.  It alleged that "Indemnity has retained the maximum amount of Management Fees allowed by the Subscriber's Agreement" and that, consequently, Indemnity breached its "fiduciary obligations to the Exchange and the Subscribers . . . by charging and keeping excessive Management Fees."  *See, e.g.*, Ex. 9 ¶ 44.

    36.    Like the *Beltz* complaints, the *Ritz* complaint was brought both on behalf of a class of all subscribers pursuant to CAFA and purportedly derivatively on behalf of Exchange.  *Id.* ¶¶ 8, 78, 92.

    37.    The *Ritz* complaint was dismissed with prejudice by this Court.  *See Ritz v. Erie Indem. Co.*, No. 17-340, 2019 WL 438086 (W.D. Pa. Feb. 4, 2019).  The Court held that all subscribers were in privity with all other subscribers because they are all "co-beneficiaries of and cosignatories to the same contract that obligates Indemnity to provide the management services" that were being challenged and the "nature of th[at] relationship creates privity for claim preclusion purposes."  *Id.* at *6.  This Court found that the compensation-cap claim in *Ritz* was the same as, or at least "essentially similar" to, the claim in *Beltz II* and "could have been brought" in that

12

action.  *Id.* at \*4.  Therefore, this Court ruled that the "*Beltz II* plaintiffs were capable of including Ritz's cause of action for the alleged excessive retention of management fees in its complaint" and accordingly the *Ritz* complaint was barred by the doctrine of claim preclusion based on the prior dismissal with prejudice in *Beltz II*.  *Id.* at \*3–6.  The Court denied a motion for reconsideration, *Ritz v. Erie Indem. Co.*, No. 17-340, 2019 WL 2090511 (W.D. Pa. May 13, 2019), and the *Ritz* plaintiff did not appeal to the Third Circuit.

38.     After the final judgments in *Beltz II* and *Ritz* were entered, the *Sullivan* plaintiffs audaciously returned to the Common Pleas Court of Fayette County and requested that the stay they requested two years before be lifted.  Pls.' Mot. Status Conf., *Erie Ins. Exch. v. Erie Indem. Co.*, No. 1712 of 2012, G.D. (Pa. Ct. Com. Pl. Fayette Cnty. June 27, 2018).  They asked the state court to assist them in bypassing the federal judgments by permitting yet another re-litigation of the question of whether Indemnity had violated its fiduciary duty in applying the 25% compensation cap under the Subscriber's Agreement.  The court refused.  Instead, the court dismissed the *Sullivan* litigation with prejudice on comity grounds based on the dismissals in the *Beltz II* and *Ritz* federal class actions.  Op. & Order, *Erie Ins. Exch. v. Erie Indem. Co.*, No. 1712 of 2012, G.D. (Pa. Ct. Com. Pl. Fayette Cnty. Dec. 2, 2020).

**D.     The Current Litigation**

39.     On August 24, 2021, Plaintiffs initiated the latest in this decade long series of challenges to Indemnity's compliance with the Subscriber's Agreement's 25% cap on Indemnity's Management Fee.

40.     Plaintiffs initially filed their complaint in the Pennsylvania Court of Common Pleas for Allegheny County.  *See* Compl., *Stephenson et al. v. Erie Indem. Co.*, No. GD-21-010046 (Pa. Ct. Com. Pl. Allegheny Cnty. Aug. 24, 2021), attached hereto as Exhibit 2.

41.     That complaint, like the eight before it, claimed that Indemnity's compensation practices had breached its fiduciary duties by setting its Management Fee at the 25% level, despite the fact it was permitted explicitly to do so by the terms of the Subscriber's Agreement.  *See, e.g.*, Ex. 2 ¶¶ 13, 47, 80.  Plaintiffs pleaded the claim as a putative class action pursuant to Pennsylvania Rules of Civil Procedure 1702, 1708, and 1790.

42.     Because the complaint pleaded an interstate case of national importance that met all of CAFA's requirements, Indemnity removed the case to this Court.  *See* Notice of Removal, *Stephenson v. Erie Indem. Co.*, No. 21-1444, Dkt. 1 (W.D. Pa. Oct. 20, 2021), attached hereto as Exhibit 10.  The case was marked as related to the *Ritz* litigation and accordingly assigned to this Court.

43.     After reviewing the Notice of Removal, and less than two weeks after Indemnity removed the case to federal court, Plaintiffs decided that they were not going to litigate the removal question embedded in their complaint.  Instead, they voluntarily dismissed their case without prejudice.  Notice of Voluntary Dismissal, *Stephenson v. Erie Indem. Co.*, No. 21-1444, Dkt. 12 (W.D. Pa. Nov. 2, 2021).

44.     The next month, Plaintiffs filed another complaint, again in the Pennsylvania Court of Common Pleas for Allegheny County ("Complaint").  *See* Compl., *Erie Ins. Exch. v. Erie Indem. Co.*, No. GD-21-014814 (Pa. Ct. Com. Pl. Allegheny Cnty. Dec. 8, 2021), attached hereto as Exhibit 1.

45.     The claim set forth in the "new" complaint was substantively identical to the one Plaintiffs had filed and dismissed only a few short weeks before.  Both complaints asserted fiduciary duty claims challenging the Management Fees that Indemnity retained.  Both complaints allege that "[a]s a fiduciary," Indemnity "was obligated at all times to act with the utmost degree

14

of good faith, honesty, candor, undivided loyalty, and full disclosure, and to exercise the high degree of care required of a fiduciary serving as the agent and attorney-in-fact" for the subscribers and Exchange. Ex. 2 ¶ 108; Compl. ¶¶ 77, 84.[3]

46.    Both complaints allege that "[i]n setting the Management Fee" in December 2019 and December 2020 "and allowing such amounts to be taken" as compensation "over the course of the last two years" ("in large part to fund dividend payments to Indemnity's shareholders"), Indemnity "breached" or "failed to comply" with its fiduciary duties. Ex. 2 ¶ 109; Compl. ¶¶ 78, 85.

47.    Both complaints allege that Indemnity "has also breached its fiduciary duties" "by failing to implement or utilize processes to ameliorate its conflicts of interest when self-dealing and when making decisions in which the rights and interests" of Exchange or the subscribers "are at odds with the rights and interests" of Indemnity "and its controlling shareholders." Ex. 2 ¶ 110; Compl. ¶¶ 79, 86.

48.    Both complaints allege that, "[i]nstead of acting in the best interests" of Exchange and the subscribers, Indemnity "has been acting in its own best interests and abusing" its "power" and its "position of trust." Ex. 2 ¶ 111; Compl. ¶¶ 80, 87.

49.    Both complaints allege that Indemnity "is taking excessive profit from the Management Fees it receives from" Exchange in order "to enrich its own shareholders specifically including its conflicted controlling shareholders who serve on" Indemnity's board of directors. Ex. 2 ¶ 112; Compl. ¶¶ 81, 88.

---

[3] The most recent complaint uses the phrase "managing agent" rather than "agent." Compl. ¶ 77.

50.     Both complaints allege that "[a]s a result" of Indemnity's breaches of fiduciary duty, Exchange and the subscribers have "suffered significant losses by having excessive funds diverted to" Indemnity and "improperly utilized for" Indemnity's "gain and self-interests instead of remaining with Exchange."  Ex. 2 ¶ 113; Compl. ¶¶ 82, 89.

51.     Both complaints allege that "Members of Exchange" have suffered from Indemnity's purported breaches of fiduciary duty, asserting that the "Members of Exchange . . . have received nothing or only *de minimis* dividends."  Ex. 2 ¶¶ 81, 83; Compl. ¶¶ 71–73.

52.     Both complaints seek the same relief in the form of a finding that Indemnity breached its fiduciary duties, damages, disgorgement of profits, and other injunctive relief.  Ex. 2 at 20; Compl. ¶¶ 82, 90.

53.     Both complaints seek to benefit the same large multi-state class of subscribers.  In fact, the latest repackaging of the same cause of action explicitly states that, as in the prior suit filed as a class action, it seeks "to benefit *all members* of the Exchange."  Compl. ¶ 16 (emphasis added).

54.     The only change Plaintiffs made was to alter their choice of the procedural mechanism under the Pennsylvania Rules through which to process their claim.  As set out above, Plaintiffs plead the same claim, in the same way, for the benefit of the same, if not an even larger, interstate group of subscribers.  Plaintiffs allege no reason, legitimate or otherwise, for dismissing, rather than just amending, their original complaint.  The reason behind their choice to dismiss to, only a short time later, file a carbon copy is obvious.  They know that an amendment after removal cannot divest the federal court of jurisdiction.  So, they are desperately trying to concoct some alternative mechanism to escape this Court and its ruling in *Ritz*.

## **GROUNDS FOR REMOVAL**

55.     The Court has jurisdiction over this action pursuant to CAFA because both the original complaint and this latest carbon copy satisfy CAFA's requirements.  Under long-settled precedents, Plaintiffs' attempt to amend and refile their complaint after removal cannot destroy CAFA jurisdiction.  On the contrary, Plaintiffs' transparent attempts to evade CAFA only further confirm that federal jurisdiction is proper here.

## I.    REMOVAL IS PROPER PURSUANT TO CAFA.

56.     The United States Supreme Court has held that CAFA's "primary objective [is] ensuring '[f]ederal court consideration of interstate cases of national importance.'"  *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013) (quoting Class Action Fairness Act of 2005, Pub.L. No. 109-2, § 2(b)(2), 119 Stat. 5).  This case obviously meets that objective.  Plaintiffs seek relief on behalf of and to benefit more than two million subscribers across 12 states and the District of Columbia.  That relief, if ever obtained, could total in the hundreds of millions of dollars.  This case is therefore an "interstate case of national importance" that falls squarely within CAFA's ambit.

### A.    CAFA Applies to State Actions that Allow 1 or More Plaintiffs to Seek Relief on Behalf of a Broader Class.

57.     CAFA applies to "any civil action" filed under Federal Rule of Civil Procedure 23 or a "similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  28 U.S.C. § 1332(d)(1)(B).  CAFA's statutory text makes clear that state actions qualify as being "class" actions for CAFA purposes even where plaintiffs have chosen not to explicitly label their case as a "class action."  Rather, CAFA's plain text provides that federal jurisdiction exists even where the state action is filed pursuant to a statute or rule that is merely "similar" to a class-action-type mechanism or where "1 or more

17

representatives" seek relief on a behalf of a broader class of individuals. *Id.* Consistent with that legislative text and its purpose, Congress explained that "the definition of 'class action' is to be interpreted liberally," and that "[i]ts application should not be confined solely to lawsuits that are labeled 'class actions' by the named plaintiff or the state rulemaking authority." S. Rep. No. 109–14, at 34–35 (2005). Thus, "lawsuits that *resemble* a purported class action should be considered class actions for the purpose of applying these provisions." *Id.* (emphasis added).

58.     Following this express guidance, to properly determine whether a case is a "class action" within the meaning of CAFA, a court must consider the rules of procedure invoked by the plaintiff, the substance of the claims being brought, and the pertinent surrounding circumstances.

59.     In evaluating a plaintiff's complaint, courts must examine whether the plaintiff is merely "artificially structuring" their lawsuit to avoid CAFA jurisdiction. *See Freeman v. Blue Ridge Paper Prods., Inc.*, 551 F.3d 405, 407 (6th Cir. 2008); *see also Erie Ins. Exch.*, 722 F.3d at 163 n.9. When assessing jurisdiction, courts traditionally "look beyond the label to analyze the substance of the claim," *Jarbough v. Att'y Gen.*, 483 F.3d 184, 189 (3d Cir. 2007), lest they "exalt form over substance," *Standard Fire*, 568 U.S. at 595. Thus, the court must independently evaluate the substance of the complaint—rather than blindly accept its labels—to ensure a plaintiff is not attempting to employ pleading artifices to deprive the federal courts of jurisdiction over an action that establishes CAFA jurisdiction. *See infra* Section III.[4] In doing so, the court will look beyond

---

[4] Courts frequently emphasize the need for a practical, rather than overly formalistic, application CAFA's jurisdictional reach. *See, e.g.*, *Badeaux v. Goodell*, 358 F. Supp. 3d 562, 567 (E.D. La. 2019) ("A lawsuit resembling a class action will not escape CAFA jurisdiction simply because it omits the words 'class action' or does not include the state rule or statute under which it proceeds as a class action."); *Thompson v. La. Reg'l Landfill Co.*, 365 F. Supp. 3d 725, 730 (E.D. La. 2019) ("In a CAFA case, a court may look beyond the pleadings to determine whether the amount-in-controversy requirement is satisfied.").

the specific procedural rules invoked by a plaintiff and evaluate its similarity to class action rules by, among other things, looking at the substance of the claim, including its lineage, the intended beneficiaries of the suit, and the relief sought.

      **B.**    **Plaintiffs' Complaints Plead "Class Actions" Within the Meaning of CAFA.**

      60.    Plaintiffs' first complaint expressly pleaded a class action under Pennsylvania's class action procedures. *See* Ex. 2 ¶¶ 92–105.

      61.    Indemnity's notice removing that complaint to this Court explained that Plaintiffs' case satisfied CAFA's jurisdictional requirements. *See* 1st Notice of Removal, Ex. 10. The content of that initial notice of removal is expressly incorporated herein. By voluntarily dismissing and then refiling their new complaint, rather than moving to remand, Plaintiffs effectively chose to acknowledge the existence of CAFA jurisdiction over their initial complaint.

      62.    Likewise, Plaintiffs' new Complaint qualifies as a class action within the meaning of CAFA. In their supposed "new" Complaint, Plaintiffs sought to paper over the fact that the fiduciary duty claim in both of their filings targets the same purported wrongdoing, is being pursued on behalf of the same multi-state class of individuals, seeks the same relief, and hence, is essentially the same complaint. The fact that this time around they dropped their reference to the Pennsylvania class action rules and instead substituted Pennsylvania Rule of Civil Procedure 2152 or, in the alternative, Rule 2177, does not alter that reality. Because Plaintiffs are unabashedly pursuing an action that is substantively identical to their prior filing, which they brought as a class action, it easily qualifies as being at least "similar" to a CAFA class action because Plaintiffs seek to serve as representatives who explicitly request universal, class-wide relief "to benefit *all members* of Exchange." Compl. ¶ 16 (emphasis added). In the end, Plaintiffs are pursuing the same claim, against the same party, for the same purported reasons, and seeking the same relief as

their first complaint. Accordingly, since Plaintiffs brought their first action as a class action, the instant clone of that action should also be considered a "class action" under CAFA.

63.     If anything, Plaintiffs' new Complaint even more obviously falls within CAFA's ambit. The initial complaint artificially sought to confine its requested class to "Pennsylvania residents." Although Indemnity's notice removing that complaint explained that Plaintiffs were necessarily seeking relief on behalf of all subscribers, Plaintiffs' new Complaint expressly states that it is pursuing universal, class-wide relief for "all members of Exchange," across multiple state lines.

64.     Also, if anything, Plaintiffs' latest effort to cloak their class claims in Pennsylvania Rules of Civil Procedure 2152 and 2177, rather than Federal Rule of Civil Procedure 23 or Pennsylvania's class action procedures, underscores the need for CAFA's protections. Although Rule 23 and Pennsylvania's class action procedures require plaintiffs to satisfy strict requirements before defendants can be subject to class-wide relief, Rules 2152 and 2177 do not grant defendants the same protections. Permitting Plaintiffs to use those rules in the manner they are attempting here would materially undermine the text and intended purpose of CAFA and enable Plaintiffs to twist the requirements for CAFA jurisdiction in such a way that even normal class action protections are unavailable.

65.     Moreover, neither Rule 2152 nor 2177 is the proper vehicle for Plaintiffs' Complaint.

66.     Rule 2152 may never be used to plead claims on behalf of Exchange. Instead, the Rule is limited to actions "prosecuted by an association . . . in the name of a member or members thereof as trustees ad litem for such association." Pa. R. Civ. P. 2151. And the Pennsylvania Rules

of Civil Procedure define an insurance association as a "corporation or similar entity," not an "association" within the meaning of Rule 2152. Pa. R. Civ. P. 2176.

67.    Nor does Rule 2177 authorize Plaintiffs' lawsuit.  That Rule applies to actions "prosecuted by or against a corporation or similar entity in its corporate name."  Although Rule 2176 defines a "corporation or similar entity" to potentially include an "insurance association or exchange," this specific Exchange, by its very nature and design, is a sui generis entity which bears no resemblance to a corporation.  It has no directors, officers, or employees, and, accordingly, no one within Exchange to pursue or manage its interests. *Supra* ¶ 7.  Further, the subscribers play no role in the leadership or management of Exchange.  Unlike shareholders in a corporation, they neither have a vote in any matter concerning Exchange nor a say in other way about the functioning of Exchange.  Pursuant to the Subscriber's Agreement, the subscribers have delegated all of their rights and power in regard to the functioning of the Exchange to Indemnity.  Rule 2177 was never meant to apply to an entity like Exchange.

68.    Ultimately, these wholly artificial labels that Plaintiffs affix to their claims cannot change the fact that the substance of the Complaint clearly pleads a CAFA interstate class action, nor the fact that these Plaintiffs have been transparent in their effort to evade federal jurisdiction. During the past decade of litigation challenging Indemnity's compliance with the 25% compensation cap, the subscribers and their lawyers have consistently pursued the claims as class actions.  That is because these subscribers and those before them, who are all in privity with each other, have challenged the Management Fee that applies equally to all subscribers across the country for the same reasons.  As a result, Plaintiffs' claims are necessarily shared by and will have the same impact on all subscribers—which is precisely why Plaintiffs are explicitly

requesting class-wide relief that would "benefit *all members* of Exchange." Compl. ¶ 16 (emphasis added).

69.    Indeed, as detailed above, Plaintiffs' initial complaint brought materially identical claims *as a class action*. And Plaintiffs' "new" Complaint is merely a rehash of their prior class action complaint. Both complaints, among other things, were brought on behalf of and seek relief for a class of *all* subscribers, which is exactly the sort of action that qualifies as a "class action" under CAFA's plain text. Although Plaintiffs' "new" Complaint "omits reference" to a specific class action rule, "it is clear from the face of the complaint" that Plaintiffs plead allegations on behalf of and seek relief for a class of subscribers within the meaning of "class action" as used in CAFA. *Williams v. Emps. Mut. Cas. Co.*, 845 F.3d 891, 901 (8th Cir. 2017).

## II.    PLAINTIFFS' VOLUNTARY DISMISSAL AND SUBSEQUENT AMENDMENT OF THEIR COMPLAINT CANNOT DEPRIVE THE COURT OF JURISDICTION.

70.    It has long been established that jurisdiction is assessed at the time of removal. *Westmoreland Hosp. Ass'n v. Blue Cross of W. Pa.*, 605 F.2d 119, 123 (3d Cir. 1979). Therefore, "events occurring subsequent to removal . . . whether beyond the plaintiff's control or *the result of his volition*, do not oust the district court's jurisdiction once it has attached." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 293 (1938) (emphasis added).

71.    Applying this bedrock principle, a long line of federal cases has held that plaintiffs cannot destroy CAFA jurisdiction by amending their complaints. "The well-established general rule is that jurisdiction is determined at the time of removal, and nothing filed after removal affects jurisdiction." *In re Burlington N. Santa Fe Ry. Co.*, 606 F.3d 379, 380 (7th Cir. 2010). "CAFA jurisdiction attaches when a case is *filed* as a class action," and "allowing plaintiffs to amend away CAFA jurisdiction after removal would present a significant risk of forum manipulation." *Id.* at 381. Congress was acutely aware that CAFA did "not alter" "current law" since "once a complaint

is properly removed to federal court, the federal court's jurisdiction cannot be 'ousted' by later events," because "[i]f a federal court's jurisdiction could be ousted by events occurring after a case was removed, plaintiffs who believed the tide was turning against them could simply always amend their complaint months (or event years) into the litigation to require remand to state court."[5] S. Rep. 109–14, at 70–71.

72.    Here, CAFA jurisdiction plainly existed when Indemnity removed Plaintiffs' first complaint. *See generally* 1st Notice of Removal, Ex. 10.  Plaintiffs thus did not divest this Court of CAFA jurisdiction simply because they first unilaterally dismissed and then pasted on a different label and re-filed the same action.

73.    "[I]t is not unusual for motions styled as Rule 41 motions or motions to dismiss to be construed as Rule 15 motions for leave to amend." *Baker v. City of Detroit*, 217 F. App'x 491, 496–97 (6th Cir. 2007).  Therefore, the same principles restricting evasive amendments following removal apply to voluntary dismissals aimed at the same objective.  Indeed, "it would be passing strange to bar a Plaintiff from divesting a federal court of jurisdiction by using Rule 15 to amend his complaint but allow him to do so using Rule 41." *Loper v. Lifeguard Ambulance Serv., LLC*, No. 19-583, 2020 WL 8617215, at *10 (N.D. Ala. Jan. 10, 2020).

74.    Courts have thus held that "it is inappropriate for a plaintiff to use voluntary dismissal as an avenue for seeking a more favorable forum" outside of the federal courts. *Thatcher*

---

[5] Accordingly, once a court is vested with jurisdiction under CAFA, even failure to certify a class does not warrant remand.  *See F5 Cap. v. Pappas*, 856, F.3d 61, 77 (2d Cir. 2017) ("Because jurisdictional facts are assessed at the time of removal, and because at that time the complaint here appeared to plead in good faith the class claim necessary for jurisdiction, the fact that the court subsequently determined that the case could not proceed as a class action under CAFA did not deprive it of subject matter jurisdiction."); *Lewis v. Ford Motor Co.*, 685 F. Supp. 2d 557, 568 (W.D. Pa. 2010) (same).

*v. Hanover Ins. Grp. Inc.*, 659 F.3d 1212, 1214 (8th Cir. 2011).  In *Thatcher*, because the plaintiff sought dismissal under Federal Rule of Civil Procedure 41(a)(2) "merely to deprive the federal court of jurisdiction," the court reversed the dismissal and remanded, directing the district court to consider "whether the motion was an improper forum-shopping measure."  *Id.* at 1215.  On remand, the district court denied the motion to voluntarily dismiss, reasoning that plaintiffs and their counsel "are not to be permitted to shop for a new and hopefully more favorable forum if it turns out that their complaint—as drawn—places them in a court not of their liking."  *Thatcher v. Hanover Ins. Grp., Inc.*, No. 10-4172, 2012 WL 1933079, at *11 (W.D. Ark. May 29, 2012); *see also Loper*, 2020 WL 8617215, at *9–11.  The same rule applies here.

75.    Plaintiffs' transparent maneuvering is especially improper given that, as noted above, they offer no logical explanation for it other than to evade this Court's jurisdiction.  After all, Plaintiffs could have remained in federal court after the first removal and simply amended their complaint there.  Thus, the only possible reason for the dismissal and the subsequent amendment must have been to position Plaintiffs to present some tortured argument that the dismissal and subsequent amendment had divested this Court of jurisdiction.  Plaintiffs certainly do not allege any facts that permit any other conclusion.  "Absent the proffer of any reason for [a plaintiff's] dismissal," where "it appears that its dismissal was intended solely to destroy diversity jurisdiction," "there is no justification for remand."  *Braud v. Transp. Serv. Co. of Ill.*, 445 F.3d 801, 809 (5th Cir. 2006); *Robinson v. Holiday Universal, Inc.*, No. 05-5726, 2006 WL 470592, at *3 (E.D. Pa. 2006) (finding, after a proper removal pursuant to CAFA, plaintiffs could not dismiss the removing defendant and "unring the bell").  *See also Hayden v. Westfield Ins. Co.*, No. 12-390, 2013 WL 5781121, at *4 (W.D. Pa. Oct. 25, 2013) (outside of the CAFA context, denying

plaintiff's voluntary dismissal as a "valiant attempt to avoid federal jurisdiction" and forum shop), *aff'd*, 586 F. App'x 835 (3d Cir. 2014).

76. This rule is consistent with longstanding Supreme Court precedent, as well as CAFA's plain text and purpose. "Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction." *Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 185–86 (1907).

77. This is precisely the sort of case that CAFA intended to be litigated in federal court. Because Plaintiffs challenge a singular, nationwide Management Fee that equally affects subscribers across multiple states, their effort to thwart Indemnity's ability to remove the case to this Court risks subjecting Indemnity to fractured, duplicative litigation and potentially contradictory outcomes in twelve other jurisdictions. *See also Metcalf v. TransPerfect Global, Inc.*, No. 19-10104, 2020 WL 7028644, at *5 (S.D.N.Y. Nov. 30, 2020) (discussing import of CAFA's purpose and finding "If the language of a statute is ambiguous, an interpretation that permitted this sort of jurisdictional gamesmanship around the purposes of the statute would generally not be favored" (internal quotation marks and citation omitted)). Plaintiffs' attempt to dismiss and refile the same complaint in this manner is an affront to the integrity of federal courts and their effort to diligently apply CAFA to "interstate cases of national importance." *Standard Fire*, 568 U.S. at 595 (quoting Class Action Fairness Act of 2005, Pub.L. No. 109-2, § 2(b)(2), 119 Stat. 5).

78. Plaintiffs cannot manipulate federal jurisdiction through their post-removal gamesmanship. Both their initial complaint and their latest Complaint should be treated as pleading an action that belongs in federal court under CAFA's plain terms.

III.    **PLAINTIFFS' TRANSPARENT EFFORTS TO EVADE CAFA JURISDICTION ONLY CONFIRM THAT FEDERAL JURISDICTION IS PROPER HERE.**

79.    In decision after decision, the Supreme Court and the lower federal courts have prohibited the precise type of pleading gamesmanship Plaintiffs have undertaken here to evade federal court jurisdiction over their claims.

80.    "CAFA was clearly designed to prevent plaintiffs from artificially structuring their suits to avoid federal jurisdiction." *Freeman*, 551 F.3d at 407.

81.    Where it is clear a plaintiff has taken action to modify or craft its pleading specifically to avoid federal court jurisdiction, courts will not "exalt form over substance," but instead will honor CAFA's "primary objective" of "ensuring '[f]ederal court consideration of interstate cases of national importance.'" *Standard Fire*, 568 U.S. at 594, 595 (quoting Class Action Fairness Act of 2005, Pub.L. No. 109-2, § 2(b)(2), 119 Stat. 5). Plaintiffs simply "cannot tailor a suit (or a series of suits) to avoid federal jurisdiction," and courts will "look[] beyond the pleadings" to discern the true criteria for jurisdiction. *Simon v. Marriott Int'l, Inc.*, No. 19-2879, 2019 WL 4573415, at *3 (D. Md. Sept. 20, 2019).

82.    Here, Plaintiffs have transparently structured their pleading in an effort to evade federal jurisdiction. After Indemnity removed Plaintiffs' initial complaint, they voluntarily dismissed and then simply refiled the same claim—seeking the same universal relief for *all* subscribers—with only a different set of labels. That gamesmanship is the same type of "poorly disguised attempt" to evade federal court jurisdiction that has been rejected by federal courts time and time again. *See, e.g.*, *Hoffman v. Nordic Nats., Inc.*, No. 14-3291, 2015 WL 179539, at *7 (D.N.J. Jan. 14, 2015), *aff'd*, 837 F.3d 272 (3d Cir. 2016); *Freeman*, 551 F.3d at 408–09.

83.    In fact, it is exactly the sort of evasion that the Third Circuit expressly said was lacking in *Sullivan*. *Erie Ins. Exch.*, 722 F.3d at 163 n.9 (distinguishing *Freeman*, 551 F.3d at 407).

84.    Plaintiffs' efforts to evade federal court jurisdiction are even more obvious when understood in the historical context of the string of lawsuits challenging Indemnity's compliance with the 25% compensation cap. Plaintiffs followed a nearly ten-year pattern, including *Beltz*, *Ritz*, and Plaintiffs' own initial complaint, of challenging Indemnity's compensation under the Subscriber's Agreement. Ex. 7 ¶¶ 48–49 (*Beltz*); Ex. 8 ¶¶ 8, 89 (*Beltz II*); Ex. 9 ¶ 78 (*Ritz*); Ex. 2 ¶ 92. Plaintiffs' legal theory and requested relief here are indistinguishable from the fiduciary duty claims made by their fellow subscribers using the class action mechanism.

85.    Plaintiffs do not even attempt to allege a legitimate basis to explain their dismissal and refiling tactic. They fail to do so for the obvious reason that it makes little sense other than to evade federal jurisdiction.

86.    If allowed to succeed, Plaintiffs' evasive tactics would allow subscribers to file a never-ending series of lawsuits until one eventually succeeds, while requiring Indemnity to defeat every single one of those suits to avoid a sweeping ruling that would apply to all subscribers. That is precisely the sort of abusive practice that CAFA was enacted to prevent. And it is also what this Court's ruling in *Ritz* prohibited.

87.    Indeed, this latest litigation is no more than a collateral state court attack on this Court's binding opinions in *Beltz II* and *Ritz*. Under those decisions, Plaintiffs' challenge to the compensation cap both lacks merit and is barred—which is why Plaintiffs are so desperate to avoid this Court's jurisdiction. Such calculated attempts to nullify federal judgments through state court actions violates the basic norms of federal jurisdiction.

88.    At bottom, Plaintiffs' own actions, coupled with the near decade of litigation that has ensued since *Sullivan*, make clear that the claims Plaintiffs assert in their latest Complaint were, have always been, and continue to be class claims brought on behalf of the millions of Exchange subscribers.  Indeed, after the Third Circuit's ruling, the *Sullivan* plaintiffs deliberately chose to stay their state court proceedings in favor of the federal class action proceedings in *Beltz*. That is because, even after securing a remand, they recognized that federal class action litigation under CAFA is the appropriate way to litigate these claims.

## IV.    THE REMAINING CAFA REQUIREMENTS ARE SATISFIED.

### A.    Plaintiffs Plead a Minimally Diverse Class of More than 100 Members.

89.    CAFA requires only minimal diversity to support federal jurisdiction.  28 U.S.C. § 1332(d)(2)(A).  Both Plaintiffs' first complaint and its latest Complaint satisfy this requirement.

90.    Indemnity's first notice of removal in this case explained that Plaintiffs' initial complaint satisfied CAFA's minimal diversity and numerosity requirements.  *See* 1st Notice of Removal, Ex. 10 ¶¶ 51–63, 67–68.  As explained above, Plaintiffs did not destroy CAFA jurisdiction by amending or refiling its complaint.

91.    Plaintiffs' latest Complaint also plainly and independently satisfies CAFA's minimal diversity and numerosity requirements.  Plaintiffs brought this action "to benefit *all members* of Exchange."  Compl. ¶ 16 (emphasis added).  As Plaintiffs allege, Exchange "consists of, its policyholders [subscribers] who are all members of the unincorporated association."  *Id.* ¶¶ 2, 21.  Exchange has over two million subscribers across the District of Columbia and 12 states: Illinois, Indiana, Kentucky, Maryland, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and Wisconsin.  *About Erie Insurance*, Erie Insurance, https://bit.ly/3nqS9wZ (last visited Jan. 26, 2022).

92.     As a result, Plaintiffs' latest Complaint challenging the Management Fee for Exchange and on behalf of the subscribers that comprise Exchange is an "interstate cases of national importance," *Standard Fire*, 568 U.S. at 595 (quoting Class Action Fairness Act of 2005, Pub.L. No. 109-2, § 2(b)(2), 119 Stat. 5), which necessarily satisfies CAFA's minimal diversity requirements.  And the potential class that would benefit from Plaintiffs' case far exceeds CAFA's minimum of 100 members.  28 U.S.C. § 1332(d)(5).

**B.     Plaintiffs' Allegations Satisfy the Amount in Controversy Requirements.**

93.     Plaintiffs assert that Indemnity's taking of a 25% Management Fee in 2020 and 2021 was excessive and, among other things, seek damages, restitution, and disgorgement of Indemnity's profits.  Compl. ¶¶ 82, 90.  In 2020 alone, the Management Fee was $1.9 billion.  *Id.* ¶ 61.  Thus, the amount in controversy clearly exceeds $5,000,000.  28 U.S.C. § 1332(d)(2).

94.     Plaintiffs also seek unspecified forward-looking injunctive relief that—whether coupled with damages or disgorgement of the allegedly excessive fee or on its own—necessarily puts more than $5,000,000 in controversy in this case.  Compl. ¶¶ 82, 90.

95.     Moreover, any finding or declaration that Indemnity breached its fiduciary duties by taking a 25% Management Fee is necessarily a finding or declaration that Indemnity breached its fiduciary duties to *all subscribers regardless of location* by taking that fee from the undifferentiated pool of premiums paid by *all subscribers*.  And any declaration or injunctive relief against Indemnity's Management Fee for 2020, 2021, or going forward, would necessarily apply to the single rate set for the Management Fee that applies to *all subscribers.*

96.     As a result, Plaintiffs' requested relief—even if not brought in *ad litem* status or on behalf of all Exchange as a whole—would necessarily impact all of Exchange and the Management Fee as a whole, which comes from a nationwide pool of the premiums paid over the last two years by *all subscribers*, along with all money held in the Exchange for loss reserves, expenses, or

dividends. Similarly, injunctive relief concerning the setting of the Management Fee necessarily would affect all subscribers to the same degree. Because Plaintiffs' Complaint will affect subscribers living everywhere from Wisconsin to North Carolina to New York and Pennsylvania, the need for removal is especially acute here so that a federal court can decide this case of national importance with one universally applicable decision.

## V.    THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED.

97.    As required by 28 U.S.C. § 1446(b), this Notice of Removal is being filed within thirty (30) days after Indemnity accepted service of the Complaint and filed its Acceptance of Service form in the Court of Common Pleas, Allegheny County, Pennsylvania. *See* Ex. 1.

98.    This Notice of Removal is being filed in the U.S. District Court for the Western District of Pennsylvania, the district court of the United States for the district and division within which the state court action is pending, as required by 28 U.S.C. §§ 1446(a) and 1441(a).

99.    This Complaint is related to *Beltz II* and *Ritz*, as well as Plaintiffs' initial complaint.

100.    Pursuant to Local Rule 3 and this Complaint's relation to *Beltz II* and *Ritz* matters, the matter should be docketed on the calendar of the Erie Division. W.D. Pa. L.R. 3, 40(D).

101.    Indemnity has not filed a responsive pleading in the action that Plaintiffs commenced against Indemnity in the Court of Common Pleas, Allegheny County, Pennsylvania, and no other proceedings have transpired in that action.

102.    Promptly after filing this Notice of Removal with the U.S. District Court for the Western District of Pennsylvania, a copy of this Notice of Removal, along with the Notice of Filing of Notice of Removal, will be filed with the Prothonotary of the Court of Common Pleas, Allegheny County, Pennsylvania, pursuant to 28 U.S.C. § 1446(d). A copy of both documents will also be served upon Plaintiffs' counsel of record. A copy of the Notice of Filing of Notice of Removal is attached hereto as Exhibit 11.

## VI.    INDEMNITY RESERVES ALL RIGHTS AND DENIES LIABILITY.

103.    Nothing in this Notice is intended or should be construed as an express or implied admission by Indemnity, including but not limited to an admission of any fact alleged by Plaintiffs; of the validity or merit of any of Plaintiffs' claims or allegations; that Plaintiffs are entitled to any of the relief they seek in the Complaint, or any other relief; or that the certification of any class of Exchange subscribers, no matter how constituted, is appropriate under Federal Rule of Civil Procedure 23, the Pennsylvania state court rules related to class certification, or any other applicable law or rule.  Further, nothing in this Notice is intended or should be construed as a limitation of any of Indemnity's rights, claims, remedies, or defenses in connection with this action.  Indemnity expressly reserves all such rights, remedies, and defenses, including those available under the All Writs Act, 28 U.S.C. § 1651(a), and the Anti-Injunction Act, 28 U.S.C. § 2283.

**WHEREFORE**, this action, as a consequence of this Notice of Removal, should be deemed removed from Common Pleas Court of Allegheny County, Pennsylvania and placed on the docket of the Erie Division of this Court.

Dated:  January 27, 2022

Respectfully submitted,

*/s/ Neal R. Devlin*
Neal R. Devlin (PA 89223)
KNOX MCLAUGHLIN GORNALL &
SENNETT, P.C.
120 West 10th Street
Erie, PA 16501-1461
Telephone: (814) 923-4841
Facsimile: (814) 453-4530


Steven B. Feirson (PA 21357)*
Michael H. McGinley (PA 325545)*
Ryan M. Moore (PA 314821)*
Carla G. Graff (PA 324532)*
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Telephone: (215) 994-4000
Facsimile: (215) 994-2222
Steven.Feirson@dechert.com
Michael.McGinley@dechert.com
Ryan.Moore@dechert.com
Carla.Graff@dechert.com

*Counsel for Defendant Erie Indemnity Company*

*pro hac vice* applications forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of January 2022, a true and correct copy of the foregoing Notice of Removal was served upon counsel of record for Plaintiffs via first class mail and email at the addresses below:

> Edwin J. Kilpela, Jr., Esq.
> Elizabeth P. Avery, Esq.
> LYNCH CARPENTER LLP
> 1133 Penn Avenue, 5th Floor
> Pittsburgh, PA 15222
> ekilpela@lcllp.com
> eavery&lcllp.com
>
> Kevin Tucker, Esq.
> Kevin J. Abramowicz, Esq.
> EAST END TRIAL GROUP LLC
> 6901 Lynn Way, Suite 215
> Pittsburgh, PA 15208
> ktucker@eastendtrialgroup.com
> kabramowicz@eastendtrialgroup.com
>
> Prothonotary, Court of Common Pleas, Allegheny County, Pennsylvania

Dated:  January 27, 2022

*/s/ Neal R. Devlin*
Neal R. Devlin (PA 89223)
KNOX MCLAUGHLIN GORNALL &
SENNETT, P.C.
120 West 10th Street
Erie, PA 16501-1461
Telephone: (814) 923-4841
Facsimile: (814) 453-4530
ndevlin@kmgslaw.com

*Counsel for Defendant Erie Indemnity Company*